# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| **PEGGY I. PETERSON,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     v. | )     **CAUSE NO. 1:09-CV-00209** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
|     **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Peggy Peterson appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and this case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Peterson applied for DIB in June 2006, alleging that she became disabled as of January 1, 2005. (Tr. 80-82.) The Commissioner denied her application initially and upon reconsideration, and Peterson requested a hearing. (Tr. 46-51, 53-55.) On April 9, 2008, Administrative Law Judge ("ALJ") Steven J. Neary conducted a hearing at which Peterson (who was represented by counsel), her daughter, and a vocational expert ("VE") testified. (Tr. 19-45.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

On December 18, 2008, the ALJ rendered an unfavorable decision to Peterson, concluding that she was not disabled despite the limitations caused by her impairments because she could perform her past relevant work as a cashier/clerk. (Tr. 8-18.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.) Peterson filed a complaint with this Court on August 4, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. PETERSON'S ARGUMENTS

Peterson alleges three flaws with the Commissioner's final decision. Specifically, Peterson claims that the ALJ (1) erred at step four of his analysis when he found that she could perform her past relevant work; (2) improperly concluded that her mental impairment was non-severe; and (3) improperly found that she had no severe impairment that would affect her lower extremities and her ability to stand or walk. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 9-12.)

## III. FACTUAL BACKGROUND[2]

### *A. Background*

As of the date of the ALJ's decision, Peterson was fifty-seven years old and had a high school education. (Tr. 5, 22, 80.) She had taken some business courses and possessed approximately seventeen years of work experience as a cashier and stocker at a hardware store, which included cutting pipe and loading/unloading trucks. (Tr. 22, 36-37, 80, 106-07, 160.) She alleges that she became disabled due to major depressive disorder, general anxiety disorder, lumbar and cervical degenerative disk disease, diabetes, shoulder pain, peripheral neuropathy,

---

[2] In the interest of brevity, this opinion recounts only the portions of the 383-page administrative record necessary to the decision.

chronic obstructive pulmonary disease ("COPD"), ateriosclerotic vascular disease, and glaucoma. (Opening Br. 2.)

At the hearing, Peterson testified that she lives with her husband but that her adult daughter plans to soon move in with them in order to assist her more with household activities. (Tr. 26-27.) She states that she is independent with her dressing and bathing, and that she cooks and performs other household tasks. (Tr. 27.) She emphasized, however, that she must intersperse these activities with numerous periods of rest, as she cannot "do a full job without sitting down and resting, or standing there and resting." (Tr. 27.) Her daughter helps her with household tasks three to four times a week, spending anywhere from several hours to an entire day with her. (Tr. 39.) She enjoys watching television for leisure and occasionally goes to visit a friend. (Tr. 27, 28.) She only drives a car if there is an emergency, as she does not consider herself a "safe" driver due to her various medical conditions. (Tr. 28, 29.)

When asked why she thinks she is unable to work, Peterson stated that her heart "does flip flops", she "can't walk very far at all", her legs hurt, she feels dizzy and off balance, and she cannot sit very long because of constant pain in her tailbone and hips. (Tr. 23-24.) She also complained of pain in her back, shoulders, and neck. (Tr. 24-25.) She takes various medications for her symptoms, which she thinks may contribute to her "fall[ing] a lot." (Tr. 24.) She stated that she can sit for ten to fifteen minutes, walk for five minutes, and stand for five to ten minutes. (Tr. 25, 30, 32.) She explained that her feet are numb and begin to burn and tingle when she stands. (Tr. 25.) Peterson elaborated that she has to change positions frequently when she is sitting due to her back pain. (Tr. 25-26, 31.) She attributes many of these conditions to her long-standing diabetes and because she has not "had the medical care that [she] should have" due to

3

her lack of insurance. (Tr. 28.)

Peterson also said that she could not return to work because she does not "get along with people very well anymore" and it would be too stressful. (Tr. 32, 34-35.) She elaborated that once a week she gets so angry that she throws things around the house.[3] (Tr. 35-36.) She does not like to leave the house unless someone is with her. (Tr. 40.)

*B. Summary of the Relevant Medical Evidence*

On March 4, 2004, Peterson was evaluated by Dr. Francis Cyran at the Northeastern Center. (Tr. 267.) He diagnosed her with depressive disorder, NOS, and cannabis dependence. (Tr. 267.) He assigned her a Global Assessment of Functioning ("GAF") score of 60 (moderate impairment), but her integrated service plan dated the same day also signed by Dr. Cyran reflects a score of 49 (serious impairment).[4] (*Compare* Tr. 267, *with* Tr. 268.) She failed to return for follow-up care. (Tr. 268.)

Peterson was seen at St. Martin's Clinic from August 2005 through June 2006 for diabetes, an ankle sprain, fatigue and dizziness, shoulder pain, peripheral neuropathy, and COPD. (Tr. 168-81.) In August 2005, a bilateral carotid duplex study revealed mild to moderate ateriosclerotic vascular disease, moderate to severe stenosis, left external carotid artery, and antegrade flow in the vertebral arteries bilaterally. (Tr. 206.)

---

[3] Peterson's daughter also testified at the hearing, essentially corroborating Peterson's subjective complaints. (Tr. 37-40.)

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

On August 15, 2006, Peterson was evaluated by Galen Yordy, Ph.D., at the request of the Social Security Administration. (Tr. 220-23.) Peterson reported current suicidal ideation and explained that she thought she had suffered from depression since childhood. (Tr. 220.) She was not participating in any treatment other than taking Prozac as prescribed by her family physician, though she had undergone psychotherapy and psychiatric hospitalization in the past. (Tr. 220.) She confided that since age 23 she regularly used marijuana to treat her medical problems. (Tr. 220.) He assigned her a GAF score of 50 (serious impairment) and diagnosed her with major depressive disorder, single episode, severe, chronic, without psychotic features; and generalized anxiety disorder. (Tr. 223.)

On August 21, 2006, Peterson saw Dr. Kevin Kelly, a cardiologist, for her multiple medical problems, which were complicated by indigence and lack of insurance. (Tr. 230.) On physical exam, he found a question of a very faint right carotid bruit. (Tr. 231.) Her femoral and posterior tibial pulses seemed reduced bilaterally, and her dorsalis pedis pulses were absent. (Tr. 231.) A cerebrovascular duplex scan showed mild bilateral internal carotid artery disease, which was not hemodynamically significant, and bilateral antegrade vertebral artery flow. (Tr. 231.)

The next day, Peterson was examined by Dr. Kerry Amstutz at the request of the Social Security Administration. (Tr. 225-29.) Dr. Amstutz observed that she ambulated normally and was able to get on and off the table and up and out of a chair. (Tr. 226.) Her cervical spine showed decreased range of motion. (Tr. 227.) Her deep tendon reflex was decreased bilaterally. (Tr. 227.) He diagnosed her with diabetes, glaucoma, blocked arteries, arthritis in the hands (although she had good grip and no obvious deformities), COPD, and damage to her feet (but with no obvious signs except for difficulty with walking on toes and heels). (Tr. 227.) He found

5

no signs of depressed affect or anxiety. (Tr. 227.)

On September 1, 2006, Dr. A. Lopez reviewed Peterson's record and concluded that she did not have a severe physical impairment, and his opinion was later affirmed by a second state agency physician. (Tr. 234, 250.) That same day, William Shipley, Ph.D., reviewed her record and concluded that her mental impairment was non-severe in that she experienced mild difficulties in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 235-48.) He concluded that she retained the capacity to perform simple, routine tasks on a daily basis without special consideration or accommodations. (Tr. 247.) His opinion was later affirmed by a second state agency psychologist. (Tr. 249.)

In November 2006, Peterson returned to the Northeastern Center, reporting increased anxiety since her husband lost his job. (Tr. 264.) She was assigned a GAF of 50 (serious impairment) and diagnosed with major depressive disorder, recurrent, moderate; and generalized anxiety disorder with recent agoraphobia. (Tr. 264.) She began counseling sessions several times a month, expressing some suicidal ideation. (Tr. 262-63.) The next month, her counselor reported that she was confused, depressed, and unable to work. (Tr. 261.) She continued to participate in counseling several times a month until February 2008, when it was documented that she was not being seen regularly due to financial problems. (Tr. 258, 260, 356-60, 363-70, 375, 376.)

In October 2007, the results of a bilateral lower extremity atrial doppler/ankle brachial index were normal. (Tr. 309.) Later that month, Peterson saw Dr. Thomas Lazoff for her complaints of low back pain. (Tr. 338-39.) She complained of diffuse numbness, tingling, and burning in both lower extremities. (Tr. 338.) Range of motion of her spine was functional,

6

though she complained of pain upon range of motion of her shoulders. (Tr. 339.) He diagnosed her with back pain, bilateral leg pain, and questionable fibromyalgia versus occult pathology. (Tr. 339.)

In November 2007, an MRI showed mild degenerative changes of her lumbar spine, particularly at L4-5 with a broad-based posterior disk bulge, and mild narrowing of the neural foramina bilaterally at L4-5. (Tr. 343.) The remainder of the exam was normal. (Tr. 343.)

On January 14, 2008, Dr. Mark Zolman opined that Peterson could return to work immediately. (Tr. 349.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

7

(7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

8

step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On December 18, 2008, the ALJ rendered his decision. (Tr. 8-18.) He found at step one of the five-step analysis that Peterson had not engaged in substantial gainful activity after her alleged onset date. (Tr. 10.) At step two, he concluded that Peterson's COPD and diabetes mellitus were severe impairments. (Tr. 10.) The ALJ then at step three determined that her impairment or combination of impairments was not severe enough to meet a listing. (Tr. 13.)

Before proceeding to step four, the ALJ assigned Peterson the following RFC and found that her subjective complaints were "not credible to the extent they are inconsistent" with such RFC:

> [T]he claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: no work at unprotected heights or operating hazardous moving machinery, and no concentrated exposure to pulmonary irritants such as fumes, odors, chemicals, dust and poor ventilation.

(Tr. 13, 14.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Peterson was capable of performing her past relevant work as a cashier/clerk as it is generally performed in the economy. (Tr. 16.) Therefore, Peterson's claim for DIB was denied. (Tr. 17.)

## C. *The ALJ's Step Four Decision Must Be Remanded*

At step four of the five-step analysis, the ALJ relied on the VE's testimony and concluded that Peterson could perform her past work as a cashier/clerk not as she performed it, but as it is generally performed in the economy. As a result, he concluded that she was not disabled. Peterson argues that the ALJ misapplied Social Security Ruling ("SSR") 82-61 at step

9

four, causing him to improperly conclude that she could perform her past relevant work. Peterson's argument is persuasive.

To elaborate, Peterson contends that her past work as a cashier/clerk at a hardware store is a "composite job" because she was the store's sole employee and therefore was required to perform many different duties, including working the cash register, placing orders, unloading trucks, cutting PVC pipe, cleaning, and repairing window screens. (Opening Br. 9-10.) A composite job under SSR 82-61 is defined as a job that "ha[s] significant elements of two or more occupations and, as such, ha[s] no counterpart in the DOT."[6] Peterson's argument then, in essence, is that an ALJ cannot find that a claimant is capable of performing her past relevant work by identifying only a subset of duties of a composite job that she can still perform.

The Commissioner disagrees, contending that Peterson "relies on a gross misreading of the SSR." (Resp. Br. 15.) It asserts that "[n]othing in SSR 82-61 prevents the ALJ from parsing a composite job into discrete duties and determining if there were any that [Peterson] could perform". (Resp. Br. 15.) It suggests that SSR 82-61 merely cautions that such a determination is best made with the benefit of vocational expert testimony when a composite job is involved, and that here the ALJ did just that, relying upon the VE's testimony for his step four conclusion.

While the Commissioner and Peterson briefed their respective interpretations of a composite job under SSR 82-61 at length, inexplicably neither party cites a single case in support of its position or against the other's. If they had picked up that laboring oar, rather than leaving it to the Court, they quickly would have learned that Peterson's position has merit and the Commissioner's does not.

---

[6] "DOT" is the abbreviation for the Dictionary of Occupational Titles.

To explain, on this record there is no real dispute that Peterson's past work as a cashier/clerk at the hardware store was a composite job under SSR 82-61—that is, the job had "significant elements of two or more occupations". In that regard, the VE specifically testified that the stocking and pipe-cutting duties would be classified as a separate job from the cashier/clerk duties under the DOT and that such stocking and pipe-cutting duties constituted "medium work." (Tr. 42-43.) The VE indicated that it was these stocking and pipe-cutting duties that turned Peterson's "light work" cashier/clerk position at the hardware store into "medium work".[7] (Tr. 42.) He then concluded that Peterson would be able to perform her past work as a cashier/clerk "not necessarily the way she performed it, but as the job is typically performed in the national economy . . . .", suggesting, in effect, that Peterson was capable of performing "light work" (cashier/clerk) but not "medium work" (stocker). (Tr. 42.)

The ALJ seemed to then latch onto the VE's theme, concluding at step four that Peterson could return to her past relevant work as a cashier/clerk "as generally performed." (Tr. 17.) In doing so, the ALJ stated: "Although the claimant performed some medium exertion duties in addition to the usual light cashier/clerk work activities, there is no evidence that she would not have been able to perform the usual cashier clerk duties on a full-time basis." (Tr. 17.) Thus, the ALJ leaves the reader with the impression that Peterson was capable of performing "light work" on a full-time basis, but not "medium work".

The ALJ's and VE's concluding statements suggesting that Peterson could not perform

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal fo walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567.

11

"medium work", however, are in direct conflict with the RFC assigned by the ALJ earlier in his decision reflecting that she could perform "a full range of work at all exertional levels . . . ." (Tr. 13.) Thus, the Court is faced with a conundrum in the record between the RFC and the ALJ's and VE's concluding statements. *See generally Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (emphasizing that the ALJ must connect the evidence of record to his conclusion through "an accurate and logical bridge"); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (stating that the Court may not "resolve conflicts in the record . . . or, in general, substitute [its] own judgment for that of the Commissioner"); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (instructing that an ALJ must minimally articulate his analysis of the evidence to allow the court "to trace the path of his reasoning").

Moreover, in rendering his analysis of Peterson's past relevant work, the ALJ ran afoul of the proper method for analyzing a composite job at step four. The relevant caselaw states that "[w]here it is clear that a claimant's past employment was a 'composite job,' an administrative law judge may not find a claimant capable of performing [her] past relevant work on the basis that [she] can meet *some* of the demands of [her] previous position, but not *all* of them." *Austin v. Astrue, Comm'r of Social Security*, No. 2:09CV1096-SRW, 2010 WL 2868217, at *10 (M.D. Ala. July 19, 2010) (emphasis added) (quoting *Bechtold v. Massanari*, 152 F. Supp. 2d 1340, 1345 (M.D. Fla. 2001)); *see also Roberts v. Astrue*, No. 8:08-CV-120-T-17EAJ, 2009 WL 722550, at *3 (M.D. Fla. Mar. 18, 2009) ("[W]here an individual cannot perform any of his previous jobs, but only *one or more tasks* associated with his past relevant work, step four of the sequential evaluation must be resolved in favor of the claimant.") (emphasis added); *Gregory v. Astrue*, No. 5:07-cv-19-Oc-GRJ, 2008 WL 4372840, at *6 (M.D. Fla. Sept. 24, 2008) ("Where

an ALJ simply classifies an applicant's 'past relevant work' according to the least demanding function of the claimant's past occupations[,] the evaluation is contrary to the letter and spirit of the Social Security Act.").

Stated another way, an ALJ "may not deem a claimant capable of performing past relevant work by dividing the demands of a composite job into two separate jobs and finding . . . her capable of performing the less demanding of the two jobs." *Gallant v. Astrue*, No. 09-357-P-S, 2010 WL 2927263, at *5-6 (D. Me. June 20, 2010). Rather, "[t]he gravamen of the caselaw . . . is that an administrative law judge must analyze whether a claimant can perform *each job* within a composite job, whether as actually performed or as generally performed in the national[] economy." *Id*.

Here, the ALJ failed to do so, as he never definitively addressed the "medium work" component (the stocking and pipe-cutting) of Peterson's past work as a cashier/clerk at the hardware store. Nor did the VE opine at the hearing whether Peterson could perform this "medium work" component. In fact, the VE and the ALJ suggested just the opposite when they indicated that Peterson could not perform her past work in "the way she performed it", but only "as generally performed" in the economy. (Tr. 42.) As a result, the ALJ only addressed a subset of Peterson's past relevant work as a cashier/clerk, and thus did not comply with the requirements of SSR 82-61 as elucidated by relevant caselaw.

Furthermore, while it is possible that the ALJ's misapplication of SSR 82-61 could constitute mere harmless error since the RFC reflected that Peterson could perform "a full range of work at all exertional levels" (Tr. 13); *see, e.g.*, *Gallant*, 2010 WL 2927263, at *6 (finding harmless error where there was substantial evidence that claimant could perform *both* functions

of a composite job as they are generally performed in the economy), the Commissioner has not suggested this, much less developed an argument on the subject. *See Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (W.D. Wis. 2008) (explaining in a social security appeal that undeveloped arguments are deemed waived) (citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007)). And, because of the conundrum in the record described *supra*, the Court simply cannot on its own definitively conclude that the error was harmless. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). Of course, as this Court has emphasized many times before, "[n]o court should be forced to engage in speculation as to the reasons for an ALJ's decision." *Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) (citation omitted).

In sum, "[a]n ALJ has a basic obligation to fully and fairly develop the record. That duty includes clarifying any ambiguity with regard to identifying a claimant's past relevant work and the duties of such jobs." *Gregory*, 2008 WL 4372840, at *7. The ALJ in this case, however, failed to fulfill this duty. Because of this shortcoming the Court is unable to determine whether the ALJ correctly applied the law at step four of the sequential evaluation, and thus the decision of the ALJ is not supported by substantial evidence. *Id.* On remand, the ALJ should fully develop the record with regard to Peterson's past relevant work as a cashier/clerk in the hardware store, specifically state whether this work was a "composite job" under SSR 82-61, and if so, definitively determine whether she has the RFC to perform the exertional demands of *all* of

the tasks of the composite job.[8] *Id*.; *see* SSR 82-61; *Austin*, 2010 WL 2868217, at *10; *Gallant*, 2010 WL 2927263, at *5-6; *Roberts*, 2009 WL 722550, at *3; *Gregory*, 2008 WL 4372840, at *6; *Bechtold*, 152 F. Supp. 2d at 1345.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Peterson and against the Commissioner.

SO ORDERED.

Enter for this 12th day of August, 2010.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

[8] Because a remand is warranted on Peterson's first argument, the Court does not need to reach her remaining two arguments.